IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 08-cr-00365-MSK

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. **MICHAEL ARTHUR GRIGGS**,
2. **CHARLES HOMER "CHIP" SHARP**,
3. **JUSTIN SHANE BLACKBURN**,
4. **MARK R. TROUDT**,
5. JASON ALAN CAIN,
6. BRETT DAVID HARDING,
7. PETER T. JENNINGS,
8. **MATTHEW KASKEL**,
9. GARLAND SCOTT RISDON, and
10. **DANIEL JOHN TRAVERS**,

        Defendants,

## ORDER REGARDING GOVERNMENT'S *JAMES* PROFFER

**THIS MATTER** comes before the Court on the Government's *James* Proffer (**#958**), and the Defendants' various responses thereto (**#958, #960, #961**)[1] . Having considered the same, the Court finds and concludes as follows.

### I. Background

This case concerns an alleged fraudulent scheme perpetrated by the owners and

---

[1] Several Defendants have entered guilty pleas pursuant to written plea agreement. This Order only incidentally addresses those Defendants. Those who have entered pleas of not guilty are designated by bold face type in the caption. Their objections are the subject of this ruling. They are referred to collectively as the "Defendants" or "named Defendants".

employees of Disaster Restoration, Inc. ("DRI"). DRI was in the business of repairing and restoring property damaged by fire, flood, or other disasters for the benefit of property owners and their insurers. DRI retained subcontractors to perform the restoration work and acted as a general contractor for each project. DRI received compensation for its work from the property owners' insurance companies. It submitted either the estimates or the invoices from the subcontractors to the insurance companies for reimbursement along with charges of ten percent of the subcontractors' charges as an overhead fee and another ten percent as profit.

According to the Indictment (**#1**), the Defendants fraudulently induced, directed, or caused, DRI's subcontractors to artificially inflate their charges, which were submitted to the insurance companies for payment. The Defendants paid subcontractors based on lower actual costs, and retained the difference between that which was billed to the insurance companies and that which was paid to the subcontractors. The Indictment charges the Defendants with, *inter alia*, a single count of conspiracy to commit mail fraud (Count 1), 56 specific counts of mail fraud related to specific payments made by insurance companies (Counts 2-57), and a single forfeiture count for the proceeds of the unlawful activities (Count 60).[2]

The Government seeks a determination pursuant to Fed. R. Evid. 801(d)(2)(E) regarding 270 statements made by purported participants in the conspiracy that would otherwise be hearsay. These statements are set forth in the Government's Proffer (#**365-3**), as are the Defendants' objections to each statement.

---

[2] The other two counts in the Indictment, Counts 58 and 59, are alleged against Defendant Sharp for extortion.

## II. Analysis

### A. Rule 801(d)(2)(E) and Procedure for Provisional Determination

Fed. R. Evid. 801(d)(2)(E) provides that a statement "is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Before admitting coconspirator statements under Rule 801(d)(2)(E), the Court must determine that: (i) a conspiracy existed; (ii) the declarant and defendant were both members of the conspiracy; and (iii) the statements were made in the course of and in furtherance of the conspiracy. *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994). The Court makes this determination on the strength of the Government's Proffer, and, as a result, the determination is "provisional," subject to the Government offering sufficient, conforming evidence of the existence, composition, and scope of the conspiracy at trial. *Id.* at 1491.[3]

The Government must demonstrate each of the elements by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). A conspiracy exists when: (i) the defendant agrees with another person to violate the law; (ii) the defendant knows of the essential objective of the conspiracy; (iii) the defendant knowingly and voluntarily participates in actions that further the conspiracy's objective; and (iv) there is interdependence among the conspirators. *United States v. Edwards*, 69 F.3d 419, 430 (10th Cir. 1995).

---

[3] A district court may hold a "*James* hearing," see generally, *United States v. James*, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917 (1979), outside the presence of the jury to determine whether the predicate conspiracy existed. Although the Defendants have requested a hearing, the Court deems a hearing unnecessary. This order is a provisional determination as to whether, if all of the proffered facts were offered at trial, the proffered statements would fall within the provisions of Rule 801(d)(2)(E).

There must be some evidence linking the defendant to the conspiracy independent of the coconspirator's statement. *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir.1987). Independent evidence may be sufficient even though it is not "substantial." *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993). The Tenth Circuit has defined "independent evidence" as simply "evidence other than the proffered [coconspirator] statements themselves." *Martinez*, 825 F.2d at 1451. In addition, the Tenth Circuit has held that a coconspirator's testimony regarding "direct observations and contacts with defendant" qualifies as independent evidence. *U.S. v. Hernandez,* 829 F.2d 988, 995 (10th Cir. 1987).

A coconspirator statement is made "during the course" of the conspiracy if it is made before "'the objectives of the conspiracy have either failed or been achieved.'" *United States v. Perez*, 989 F.2d 1574, 1579 (10th Cir. 1993) (*en banc*) (quoting the Advisory Committee Note to Fed.R.Evid. 801(d)(2)(E)). A statement is in furtherance of the conspiracy if it is intended to promote the conspiratorial objectives. *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007). This includes statements that explain events of importance to the conspiracy in order to facilitate its operation, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, and statements of a coconspirator identifying a fellow coconspirator. *Id*. However, in general, mere narratives between coconspirators or narrative declarations of past events are not "in furtherance" of conspiracy. *United States v. Roberts*, 14 F.3d 502, 514-15 (10th Cir. 1993).

**B.     The Conspiracy**

The Government's Proffer includes statements by several employees of DRI and by

4

subcontractors as well as documents such as estimates, invoices, and accounts payable records. This evidence shows that DRI acted as general contractor in construction projects involving repair, restoration, and reconstruction of residential and commercial properties damaged by fire, water, or other disasters. DRI managed the overall project and hired subcontractors to perform the needed components of the work. The ultimate "client" was generally an insurance company covering the cost of repairing the damage to the property. DRI would obtain bids from subcontractors, hire the winning bidder, and then pay the subcontractor's invoice on the project. DRI would receive payment from the client insurance company for the entire project.

The proffered evidence indicates that to improve DRI's profit margin, DRI employees requested that certain subcontractors provide DRI with a "discount" from the amount that DRI billed the insurance company as the cost of the subcontractor's services. Sometimes this was achieved by simply demanding a reduction of the subcontractor's invoice from the bid price given to the insurer, purportedly in exchange for quick payment or future work with DRI. More commonly, however, the practice was to build the "discount" into the bid by having the subcontractor submit a genuine bid and an inflated bid. Although the higher bid price would be represented to the insurance company as the cost charged by the subcontractor, DRI would actually pay the lower amount to the subcontractor, and keep the difference. In other words, DRI would receive the discount but the client insurer would not. DRI employees would also have the subcontractors submit duplicate invoices, one with the inflated cost billed to the insurance company and one with the actual cost paid to the subcontractor; the inflated invoices were sometimes submitted to the insurance company to show actual costs.

The "discount" process was discussed openly at meetings at DRI. Top management at

5

DRI instructed lower level employees on how to get subcontractors to go along with the scheme, including explaining the process and amount by which the bids would be inflated. Subcontractors were often told to take their genuine bid and then divide it by either .7 or .8, which would result in a figure inflated by approximately 20-30%. The invoices were to be submitted by mail for payment to DRI. The inflated bids, and sometimes the corresponding inflated invoices, were submitted to the insurance company.

If the proffered evidence were presented at trial and was unrebutted, it would show all of the named Defendants were employees of DRI during some or all of the period in which the alleged fraud occurred (2003 to 2006). All were involved in the bidding and/or billing process at DRI. All attended weekly meetings where the DRI's business practice was openly discussed. All were aware of and participated in the bidding/billing process that is the subject of the indictment. In particular, Defendant Griggs was the owner and CEO of DRI. Defendant Sharp was the COO of DRI. Defendants Blackburn and Troudt were estimators who dealt directly with subcontractors and their bids. Defendant Kaskel was a project manager. Defendant Travers was the Supervisor of DRI's Emergency Section. Both dealt with subcontractors. At the direction of Defendants Griggs and Sharp, Defendants Blackburn, Troudt, Cain, Harding, Jennings, Kaskel, Risdon and Travers and non- indicted coconspirator Christopher Wattier instructed subcontractors working for DRI to inflate bids. Defendants Sharp, Blackburn, Troudt, Cain, Harding, Jennings, Kaskel, Risdon and Travers also instructed subcontractors to provide DRI with duplicate bids in differing amounts. Defendants Blackburn, Troudt, Cain and Harding submitted false and inflated subcontractor bids to insurance companies.

Assuming the proffered evidence were admitted at trial, and not rebutted, the Court finds

that it would be sufficient for a *prima facie* showing of a conspiracy among Defendants Griggs, Sharp, Blackburn, Troudt, Cain, Harding, Jennings, Kaskel, Risdon, Travers, and Christopher Wattier (not indicted) to defraud insurance companies.[4] The object of the conspiracy was to induce insurance companies to rely on false, inflated bids and invoices in paying DRI for its subcontractor costs. The proffered evidence would show that the business practices that are the subject of the Indictment occurred during 2003 through 2006.[5]

C.  **Proffered Statements**

The Court declines to reprint here all 270 statements that the Government contends fall within the provisions of Rule 801(d)(2)(E). Instead the statements are grouped by type.

   1.  **Statements Directly Pertaining the Double Bid/Invoice Procedure**

The vast majority of the identified statements describe or refer to inflated or "discounted" bids and invoices. These statements include conspirators instructing employees or

---

[4] The Defendants contend that the dual invoice system is a generally accepted practice in the industry and that the Government's fraud theory relies on a formulation that is not accepted in the industry - that a general contractor is entitled to costs plus 10% overhead and 10% profit. This is essentially an argument that there was no deception by the Defendants; therefore, there was no illegal objective. The question of whether the practice used by DRI was deceptive is a question of fact for the jury.

[5] Some Defendants contend that because Government has not specified when each of them entered the conspiracy, the conspiracy cannot be defined and the Court cannot determine whether a particular statement was made before, after or while the declarant and the defendants against such statement is offered.

   The Court rejects this objection for two reasons. First, the conspiracy is both time and substance consonant with the business operation of DRI. During that period all of the named Defendants were engaged in aspects DRI's bidding/billing process and participated in periodic meetings where the business strategy was explained and discussed. This is sufficient for purposes of this provisional ruling. Second, only Kaskel and Troudt have affirmatively argued that they were not DRI employees between 2003 and 2006. Their particular circumstances are addressed independently.

7

subcontractors on calculating and submitting the inflated bid/invoice, *see, e.g.,* Proffer # 115 ("Scott Risdon explained to Cheryl Lamping [presumably a subcontractor] that he needed her to add 20% to her estimate because this was the only way that DRI would make any money off their work. Risdon told Lamping the insurance companies only pay the amount of the subcontractor's estimate to DRI."), statements to subcontractors seeking to obtain repayment of the purported "discount," *see, e.g.,* Proffer # 144 ("On the Loveland job at the Foothills Apartments, Justin Blackburn demanded a payment back from CES for this job. CES had been paid directly by the insurance company."), and statements among coconspirators acknowledging the existence of the conspiracy, facilitating its objective and informing each other of its status. Subject to time limitations specified below, such statements[6] were made in the course of and to further the objectives of the conspiracy and therefore presumptively fall within the provisions of F.R.E. 801(d)(2)(E).

### 2. Statements Describing "Discounts" Without Reference to Duplicate Bids or Invoices

A number of the statements refer to efforts by DRI to obtain "discounts" or "credits" from certain subcontractors but do not expressly refer to the bidding/billing process at issue. *See, e.g.,* Proffer # 109 ("On the Loveland job, Scott Risdon told Tim Jennings [presumably a subcontractor] to give DRI a $1500 credit so that Risdon could get the job to come within budget. Risdon told Tim Jennings that Chip Sharp wanted him to do this."). Although these statements do not refer to the object of the conspiracy, they demonstrate DRI's business practice

---

[6] These statements are found at ## 1-6, 8-16, 28, 30-35, 37-38, 40-69, 73, 79-84, 87-88, 92-93, 97, 99-106, 108, 115-116, 119-127, 131-134, 136-142, 144-145, 155-157, 159-188, 190-196, 198-204, 210-211, 213-225, 228-230, 232, 234-239, 241-242.

of obtaining discounts from subcontractors which arguably created an environment in which the bidding/billing process functioned. Viewed in that light, the statements evidence practices that support and further the specific objective of the conspiracy. In addition, some statements include phrases such as "quick pay" discount and "cookie," which the Government submits are code terms referring to the scheme of representing to the insurers that a subcontractor's bid/invoice was higher than what DRI would actually pay. *See, e.g.*, Proffer # 177, 217. In addition, evidence indicating that discounts were extended to DRI, but not passed on to the insurer could be considered part of the scheme to obtain payments from the insurer in excess of actual costs. Thus statements in this category[7] fall within F.R.E. 801(d)(2)(E), although their use may be limited by timing restrictions.

   3.   **Statements Regarding the Use of Mail**

The Government also identifies several statements by conspirators in which they instruct subcontractors to submit invoices by mail. Upon a showing that the invoices at issue were those used in the conspiracy, such statements are plausibly within the course of and in furtherance of the conspiracy, and therefore fall within the provisions of F.R.E. 801(d)(2)(E).[8]

   4.   **Statements To Control Damage or to Conceal Objective of Conspiracy**

Several statements appear to involve the conspirators' attempts to conceal the objectives of the conspiracy, to reassure participants or to prevent damage to the conspiracy. This includes statements urging others not to disclose pricing information to insurers or homeowners and

---

[7] These are Proffered Statements ## 70, 107, 109-112, 114, 117-118, 128-130, 135, 143, 146-151, 158, 209, 212.

[8] These are Proffered Statements: ##7, 189, 231.

statements to non-participants with a false explanation for why inflated bids or double invoices were obtained. Subject to the timing limitations, discussed below, such statements can be considered to be in the course of and in furtherance of the conspiracy in that they are intended to promote the objectives of the conspiracy by preventing detection and encouraging the continuation of the conspiracy, thereby falling within the provisions of F.R.E. 801(d)(2)(E).[9]

> 5. **General Statements Regarding Profits and Bonuses**

A number of statements in the Government's Proffer involve the conspirators discussing or bragging about DRI's profits and bonuses earned by employees as a result of coming in under budget. These profits often appear to be attributable to the alleged scheme. The Government argues that these statements are in furtherance of the conspiracy because they amount to "puffing" or "boasting" in the promotion of the conspiracy. *See, e.g., United States v. Johnson*, 872 F.2d 612, 623 (5th Cir. 1989) ("statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed, are properly considered to be statements in furtherance of the conspiracy."). The Government also contends that the statements were intended to recruit others into the conspiracy.

There is an insufficient basis in the Proffer to determine that the statements at issue were designed to recruit, to obtain the confidence or allay the suspicions of the person to whom the statements were directed. These statements appear to be simply boasts about profits and bonuses and there is no showing of how they further the objectives of the conspiracy. Alternatively, the statements are simply narratives about past events with no prospective purpose. Therefore,

---

[9] These are Proffered Statements: ## 20-27, 39, 70-72, 75-78, 86, 89-91, 94-96, 152-154, 208, 216, 226-227.

10

absent alternative or additional foundation for their admission, such statements[10] are not subject to Rule 801(d)(2)(E).

6.   **Fax Cover Sheets and Other Efforts to Obtain Payment**

The Government also seeks a determination with regard to statements on fax cover sheets that accompanied billing statements or invoices sent by DRI personnel to the insurers. These statements refer to the performance of pending jobs. They do not refer to the bidding/billing practice at issue, and it is not clear for what purpose they would be offered.

If not offered for the truth of the statements contained on the fax cover sheet, the statements do not fall within F.R.E. 801 at all. To the extent that they are offered to prove the facts stated in the transmission, it is not apparent on this record that the statement was made in furtherance of the conspiracy. Therefore, on this showing, these statements would not fall within Rule 801(d)(2)(E).[11]

In contrast, Proffer #233 ("Michael Griggs implied that Rick Whitworth of State Farm was holding up the final payments to DRI on the Jemm Job. Griggs told Whitworth that if Griggs did not receive this payment of over $1 million dollars by the end of the week, then there would be trouble.") is apparently a statement designed to obtain payment from an insurer consistent with and in furtherance of the conspiratorial objective. Accordingly, it would fall within the provisions of Rule 801(d)(2)(E).

7.   **Other Statements**

Several statements in the Proffer do not appear to have any connection to the conspiracy

---

[10] These are Proffered Statements: ## 29, 36, 74, 85, 113, 197, 205-207.

[11] These are Proffered Statements: # 244-270.

11

or are not statements made during and in furtherance of the conspiracy. Accordingly they do not fall within the ambit of Rule 801(d)(2)(E).[12]

The determinations in this Order provisional, dependant upon admission of evidence establishing the conspiracy defined herein.

**D.      Objections based on the Time a Statement was made**

   **1.      Statements made after the conspiracy was concluded**

The Defendants contend that a number of the proffered statements were made after the conspiracy was concluded - when the business of DRI ended. As a consequence they argue that such statements are not admissible under F.R.E. 801(d)(2)(E).

The conspiracy demonstrated by the record made in conjunction with this proffer ended with the search warrant at DRI on December 7, 2006. Ordinarily, statements made after the conclusion of a conspiracy are not admissible, and mere efforts to conceal the existence of the concluded conspiracy are not considered to be in the course of and in furtherance of the conspiracy. *See Krulewitch v. United States*, 336 U.S. 440, 442-44 (1949); *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988) ("concealment after the main conspiracy has ended falls beyond the purview of the coconspirator exception."). It is possible that once a conspiracy ends, a new conspiracy may be created to conceal the first; however, in such a case all of the elements of a conspiracy charge must be present to establish a second conspiracy, and mere efforts to keep the previous conspiracy a secret do not amount to a new conspiracy. *Grunewald v. United States*, 353 U.S. 391, 401–02 (1957) (cautioning that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be

---

[12] These are Proffered Statements ## 14, 98, 240, 243.

implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."). Here, there is no alleged conspiracy to cover up the activities of DRI that extended beyond its operation. In the absence of a showing of how statements made by coconspirators after December 7, 2006 were made during or in furtherance of the alleged conspiracy, they do not fall within F.R.E. 801(d)(2)(E).[13]

### 2. Statements made after Defendants withdrew from the Conspiracy

Defendants Kaskel and Troudt contend that they withdrew from the conspiracy in 2005, and therefore certain statements made thereafter do not fall within F.R.E. 801(d)(2)(E).

#### a. Statements by Mr. Troudt

It is undisputed that Mr. Troudt stopped working at DRI in September 2005. In December 2005, he implicated himself and others in statements to N.I.C.B. investigators. Mr. Troudt contends that certain statements attributed to him after his cooperation with investigators (*e.g.*, Proffer ## 17 - 19) were not made in the course of and in furtherance of the conspiracy.

The Court agrees. At the time at which he made these statements, Mr. Troudt had ceased to be a coconspirator, and there is no showing that his statements were intended to further the

---

[13] The Government has included statements drawn from interviews of Defendant Cain, Griggs, Harding, Jennings, Risdon and Troudt. The admission of these statements potentially involves two layers of analysis. If the Government seeks to admit the coconspirator statement either through a document or by testimony of the interviewer, the first layer of hearsay is in the document or interviewer's report of a statement made by the interviewee. F.R.E. 801(d)(2)(E) would not remedy the hearsay status because the reported statement (that of the interviewee) was not made during the course of the conspiracy. If, however, the Government calls the interviewee to testify to a statement made by another coconspirator during the course of the conspiracy, the statement could fall within the parameters of F.R.E. 801(d)(2)(E). For purposes of this analysis, the Court has assumed that the latter circumstance will occur, and thus has analyzed the statements based upon their nature and content.

course of the conspiracy or to protect it from discovery. Thus, Mr. Troudt's statements fall outside of F.R.E. 801(d)(2)(E) if offered as against other coconspirators. F.R.E. 801(d)(2)(E) has no applicability to statements made by Mr. Troudt offered against him.

### b. Use of statements by coconspirators against Mr. Kaskel

Mr. Kaskel contends that he withdrew from the conspiracy on February 16, 2005 by renouncing the double bid/invoice practice, and that he was fired from DRI three weeks later. The Government does not appear to dispute this. Treating the date of Mr. Kaskel's termination of employment as the point at which he no longer participated in the conspiracy, statements made by coconspirators made after he withdrew from the conspiracy would not be admissible against him absent a showing that his participation in the conspiracy continued after termination of his employment. There being no such showing, such statements cannot be offered against Mr. Kaskel pursuant to F.R.E. 801(d)(2)(E).[14]

Dated this 27th day of February, 2012

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
United States District Judge

---

[14] These include Proffered Statements ## 4-5, 20-32, 42-46, 51-54, 66, 71-72, 75-78, 86-97, 100-105, 107, 109, 124-125, 131, 133-136, 139-142, 150-51, 157-161, 178-180, 183, 193, 198-203, 208-211, 226, 232, 238, 241.